**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NUANCE COMMUNICATIONS, INC. A Delaware corporation,

    Plaintiff,

v.

ABBYY SOFTWARE HOUSE, INC., a California corporation, and LEXMARK INTERNATIONAL, INC., a Delaware corporation,

    Defendants.

No. C 08-02912 JSW

**CLAIM CONSTRUCTION ORDER**

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). This Order construes the eleven claim terms selected by the parties, which appear in several of the patents at issue in this case, United States Patent No. 6,038,342 ("the '342 Patent") called 'Optical Character Recognition and Apparatus," United States Patent No. 5,261,009 ("the '009 Patent") called 'Means for Resolving Ambiguities in Text Passed Upon Character Context," and United States Patent No. 381,489 ("the '489 Patent") called "Optical Recognition Method and Apparatus."

**BACKGROUND**

Nuance Communications, Inc. ("Nuance") contends that the remaining defendants, Abbyy Software House and Abbyy USA Software House, Inc. ("Abbyy") and Lexmark International, Inc. (collectively "Abbyy/Lexmark") infringe nine of Nuance's imaging patents.

Of those nine, five relate directly to Optical Character Recognition ("OCR") and are the subject of the present claim construction process. OCR refers to the translation of an image containing text to an editable format.

The first commercially available OCR systems were "single-font" systems, capable of recognizing only one character font. The second class of OCR systems, referred to as omnifont systems, was able to recognize a much larger number of fonts in a wide range of point size and spacing, but performed slowly due to the unpredictability and greater variation of input. According to Nuance's OmniPage series of patents, the intention was to introduce significant improvements to the OCR technology, thereby allowing omnifont systems to operate as quickly as single-font counterparts, which retaining their flexibility.

The Court shall address additional facts as necessary in the remainder of this Order.

## ANALYSIS

**A.  Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc*. *v*. *Safari Water Filtration Sys*., *Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372. The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments*, *Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-981.

1  The starting point of the claim construction analysis is an examination of the specific
2  claim language. A court's "claim construction analysis must begin and remain centered on the
3  claim language itself, for that is the language that the patentee has chosen to particularly point
4  out and distinctly claim the subject matter which the patentee regards as his invention."
5  *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the
6  absence of an express intent to impart a novel meaning to a term, an inventor's chosen language
7  is given its ordinary meaning. *York Prods.*, *Inc. v. Cent. Tractor Farm & Family Center*, 99
8  F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary
9  meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v.*
10 *Biocrest Mfg.*, *L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs*
11 *Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define
12 the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in
13 all cases with the actual words of the claim"). A court's final construction, therefore, must
14 accord with the words chosen by the patentee to mete out the boundaries of the claimed
15 invention.
16  The court should also look to intrinsic evidence, including the written description, the
17 drawings, and the prosecution history, if included in the record, to provide context and
18 clarification regarding the intended meaning of the claim terms. *Teleflex*, *Inc. v. Ficosa N. Am.*
19 *Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they
20 are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315
21 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a
22 sort of dictionary, which explains the invention and may define terms used in the claims."
23 *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to
24 limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys.*,
25 *Inc*. *v*. *Advanced Cardiovascular Sys.*, *Inc*., 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing
26 that when the specification "makes clear that the invention does not include a particular feature,
27 that feature is deemed to be outside the reach of the claims of the patent, even though the
28

3

language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

Intent to limit the claims can be demonstrated in a number of ways. For example, if the patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the disputed claim term in either the specification or prosecution history," a court will defer to that definition. *CCS Fitness*, *Inc*. *v*. *Brunswick Corp*., 288 F.3d 1359, 1366 (Fed. Cir. 2002). In order to so limit the claims, "the patent applicant [must] set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367. For example the presumption of ordinary meaning will give way where the "inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

However, limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary. *Id*. at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms. *Phillips*, 415 F.3d at 1323.

4

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original). When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

Dictionaries also may play a role in the determination of the ordinary and customary meaning of a claim term. In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meanings of words...." *Phillips*, 415 F.3d at 1322. The *Phillips* court, however, also admonished that district courts should be careful not to allow dictionary definitions to supplant the inventor's understanding of the claimed subject matter. "The main problem with elevating the dictionary to ... prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within in the context of the patent." *Id.* at 1321. Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

In addition, a court has the discretion to rely upon prior art, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584. Referring to prior art may make it unnecessary to rely upon expert testimony, because prior art may be indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

**B. Claim Construction.**

**1. "Template"**

Claim 1 of the '342 Patent recites a "method of optically recognizing characters on a medium and storing a template of said recognized characters in a template cache for recognition of subsequent characters on said medium...." (27:29-32.) The word "template" also appears in Claims 4, 6, 7, 13, 14, and 18.

Abbyy/Lexmark argue that the term "template" must be construed to mean "A data structure comprising a header field comprising offset pointers to the original pattern of the character recognized through feature analysis, a 'must-be-off' pattern derived from said original pattern, and a 'must-be-on' pattern derived from said original pattern." (Parties' Amended Final Joint Claim Construction and Pre-hearing Statement ("Statement"), Ex. 1.) Nuance, on the other hand, argues that only the word "template" should be construed to mean "A representation of the patterns, shapes, or images of a character." (*Id.*)

The key distinction between the two proffered constructions is whether the embodiment of the "must-be-on" and "must-be-off" patterns should be read into the construction of the claim term. In fact, in Claim 2, 3, 8, and 15, the patent actually reserves the dependent claims to cover the specific embodiment in which the template may consist of the "must-be-on" and "must-be-off" patterns. Abbyy/Lexmark's proposed construction would render the dependent claims superfluous.

In general, the doctrine of claim differentiation recognizes "that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (quoting *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999)). Thus, there is a presumption that "[t]o the extent the absence of such difference in meaning and scope would make a claim superfluous, ... the difference between claims is significant." *Id.* (quoting *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)).

1  That presumption may be overcome, however, by the written description of the patent or its
2  prosecution history. *Id.*

3  The Court finds that the general term "template" should be construed using the broad
4  construction proffered by Nuance, in which any particular template may – or may not – include
5  the "must-be-on" and "must-be-off" patterns. The Court finds no reason to overcome the
6  presumption of claim differentiation or to render the dependent claims in the patents entirely
7  superfluous or redundant. The specification permits for an allowance that characters may be
8  within predetermined tolerances, but does not require that they be either in the must-be-off or
9  must-be-on patterns.

10  Accordingly, the Court construes the term "template" to mean: "A representation of the
11  patterns, shapes, or images of a character."

**2. "Character"**

13  Claim 1 of the '342 Patent recites a "method for optically recognizing characters on a
14  medium and storing a template of said recognized characters in a template cache for recognition
15  of subsequent characters on said medium...." (27:29-32.) The word "character" also appears in
16  Claims 4, 6, 7, 13, 14 (as dependent on 13), and 18. The word "character" also appears in
17  Claim 7 of the '489 Patent and Claim 22 of the '009 Patent.

18  Abbyy/Lexmark argue that the term "character" should be construed to mean "A
19  character is a single, individual symbol from a known set of symbols, not joined with any other
20  symbol, identifiable as such by a segmentation process. Examples of characters are letters,
21  numerals and special numbers such as commas, quotation marks and semicolons." (Statement,
22  Ex. 1.) Nuance, on the other hand, argues that the term "character" should be construed to
23  mean "One or a group of adjacent letters, digits, or other symbols." (*Id.*)

24  The key distinction between the two proffered constructions is that Abbyy/Lexmark
25  attempts to narrow the construction to refer to only a single, identified letter, not, as Nuance
26  proffers, a possible multiple symbol character. Nuance contends that a term singular may be
27  construed to connote both a singular and plural form of the word. *See Baldwin Graphic Sys.,*

7

1  *Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one
2  or more' is best described as a rule, rather than merely a presumption or even a convention.
3  The exceptions to this rule are extremely limited: a patentee must 'evince[] a clear intent' to
4  limit 'a' or 'an' to 'one.'"); *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir.
5  2000) ("Unless the claim is specific as to the number of elements, the article 'a' receives a
6  singular interpretation only in rare circumstances when the patentee evinces a clear intent to so
7  limit the article."). Further, Nuance argues, the inventors recognized that the segmentation
8  process may sometimes yield a multi-symbol character, such as 'ite' and explicitly accounts for
9  this situation in the patent. (*See* '342 Patent at 24:62-67.)

10  Abbyy/Lexmark argues that the '342 and '489 Patents compel the construction of the
11  term 'character' to indicate a single, individual symbol or letter because the patents explicitly
12  describe the parsing process to render segments of a line of text into individual characters,
13  which are meant to be both individual and isolated. (*See* '342 Patent at 4:25-27; 15:61-62; '489
14  Patent at 4:27-29, 16:31-32.) Further, Abbyy/Lexmark contends that in the section of the '342
15  Patent addressing the instance in which the invention mistakenly grabs the term 'ite' instead of
16  its composite letters, the patent describes the use of templates of single, individual characters to
17  identify single characters by parsing the segment into the characters 'i' and then 't' and
18  following. (*See* '342 Patent at 24:29-49.)

19  However, in order to provide a consistent construction of the term, the Court would be
20  remiss to limit the construction to a single, individual symbol or letter, where the patent clearly
21  and specifically discloses multi-symbol characters such as "ite" and "ff" and "ffi." (*See* '342
22  Patent at 24:34-36, 26:59-64; '009 Patent at 23:4-9.)

23  Accordingly, the Court construes the term "character" to mean: "One or a group of
24  adjacent letters, digits, or other symbols."

25  **3.  "Identifying"**

26  The word "identifying" appears in Claims 1, 4, 6, and 18 of the '342 Patent and also
27  appears in Claim 7 (as dependent on Claim 2) of the '489 Patent.

28

Nuance asserts that this term does not require construction, while Abbyy/Lexmark asserts that it does. However, Abbyy/Lexmark actually includes the term identifying in its construction of the term itself and tries to read into the term the methods of feature analysis and template matching.

Abbyy/Lexmark argues the term "identifying" should be construed to mean "Determining the identity of an unknown character through feature analysis or template matching or both." (Statement, Ex. 1.) Nuance asserts that this term is a simple word used in its every day, commonly understood way and should be given its plain and ordinary meaning. *See, e.g., Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone.") In addition, the term identifying appears throughout portions of the patents that do not allude to the specific processing and may be analyzed according to any one of a number of techniques. Therefore, the Court does not find it persuasive to limit the construction of the term to only either feature analysis of template analysis.

Accordingly, the Court construes the term "identifying" to mean: " identifying."

**4.    "Shape characteristics"**

The word "shape characteristics" appears in Claim 1 of the '342 Patent. This is the only place this term appears.

Again, Nuance asserts that this term does not require construction, while Abbyy/Lexmark asserts that it does. "Victory in an infringement suit requires a finding that the patent claim covers the alleged infringer's product or processes, which in turn necessitates a determination of what the claim terms mean." *Markman*, 517 U.S. at 374. Thus, this Court will construe the term "shape characteristics."

Abbyy/Lexmark argues the term "shape characteristics" should be construed to mean "Statistical information derived from a horizontal window and a vertical window comprising profile data, polygonal representations, phase change information, and counts of the number of

9

1 on pixels in each row of the character." (Statement, Ex. 1.) Nuance again asserts that this term
2 should be given its plain and ordinary meaning without importing numerous limitations from
3 the specifications as attempted by Abbyy/Lexmark in its proposed construction.
4 Abbyy/Lexmark's proposed construction clearly attempts to import the limitations of a shape
5 characteristic analyzing process disclosed in one specific embodiment into the construction of
6 the otherwise generic term. (*See* '342 Patent at 20:45-50.) In that instance, the shape
7 characteristics are extracted from the feature analysis program disclosed in the patent, but it
8 does not allow the Court to import the limitations into the construction of the term. In its
9 argument, Abbyy/Lexmark contends that the shape characteristics are extracted from the feature
10 analysis process in the form of statistical information such as profile data, polygon
11 representations of the characters, phase change information, and counts of the numbers of on
12 pixels in each row of the character. (*See* '342 Patent at 20:47-50.) However, these are
13 limitations of this specific embodiment. "Limitations from the specification (such as from the
14 preferred embodiment) may not be read into the claims, absent the inventor's express intention
15 to the contrary." *Teleflex*, 299 F.3d at 1326 ; *see also CCS Fitness*, 288 F.3d at 1366.

16 Unlike the holding in *ICU Medical, Inc. v. Alaris Medical Sys., Inc.*, 558 F.3d 1368,
17 1374 (Fed. Cir. 2009), the Court finds that there is sufficient intrinsic evidence that the term
18 would not include the limitations Abbyy/Lexmark seeks to impose. The patent describes a
19 number of processes and does not restrict the meaning of the term "shape characteristics" to the
20 single description outlined by Abbyy/Lexmarks' proposal. However, the Court finds that the
21 description of the term in its responsive brief is more explicative than the term itself and adopts
22 the construction "features of characters" which are extracted using several different means, as
23 described in the patent.

24 Accordingly, the Court construes the term "shape characteristics" to mean: "features of
25 characters."

26     **5.    "Feature analysis"**
27 The phrase "feature analysis" appears in Claims 4, 6, 14, and 18 of the '342 Patent.
28

10

Abbyy/Lexmark argues that the term "feature analysis" should be construed to mean "An analysis of statistical information derived from a horizontal window and a vertical window consisting of profile data, polygonal representations, phase change information, and counts of the number of on pixels in each row of the character." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "feature analysis" should be construed to mean "Recognizing a character in an image by routines that extract features of the character and analyze the features." (*Id.*)

In the specification, in a heading entitled "FEATURE ANALYSIS," the patent sets out that "[t]he preferred embodiment of the present invention discloses a plurality of routines for analyzing the features of images passed as input to the feature analysis process," with each routine called an "isit ... (e.g., 'is it' an a)." ('342 Patent at 19:37-45.) As isit can be implemented in a variety of ways, not just using the polygon fitting and the delineated statistical information in Abbyy/Lexmark's restrictive construction. (*See id*. at 23:18-30.)

Accordingly, the Court construes the term "feature analysis" to mean: "Recognizing a character in an image by routines that extract features of the character and analyze the features."

### 6. "Template matching"

The phrase "template matching" appears in Claims 7, 14, and 18 of the '342 Patent.

Abbyy/Lexmark argues that the term "template matching" should be construed to mean "A character recognition process that compares an unknown character (an image in a window) to each template in a template cache until a match occurs or the cache is exhausted by constructing must-be-on and must-be-off arrays from the unidentified image, making a dimension check, and comparing must-be-on and must-be-off pixel information." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "template matching" should be construed to mean "A character recognition process in which representations of the patterns, shapes, or images of an unknown character are compared with previously generated representations of the patterns, shapes, or images of known characters." (*Id.*)

11

Here, again, Abbyy/Lexmark tries to import a limitation from the specification for the term template to necessarily include the 'must-be-on' or 'must-be-off' feature. This construction has already been rejected by the Court. Secondly, Abbyy/Lexmark seeks to have the "until a match occurs or the cache is exhausted" become part of the construction of the term template matching. The Court does not find an explicit or express intent to add in a limitation that the template comparison stops once a match is found. Rather, the patent appears to indicate that the matching continues to occur within the library cache regardless of whether a single match is found. There is no indication in the intrinsic evidence that the inventors expressed a clear intent to restrict or exclude template matching only until a match is found. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909 (Fed. Cir. 2004) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the invention is limited to that context." ) (internal quotation omitted). The Court declines to limit the claim to the preferred embodiment disclosed in the specification.

Accordingly, the Court construes the term "template analysis" to mean: "A character recognition process in which representations of the patterns, shapes, or images of an unknown character are compared with previously generated representations of the patterns, shapes, or images of known characters."

### 7. "Second character recognition process"

The phrase "second character recognition process" appears in Claim 7 of the '342 Patent.

Abbyy/Lexmark argues that the term "second character recognition process" should be construed to mean "feature analysis process." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "second character recognition process" should be construed to mean "A process for recognizing a character that is different than the first character recognition process." (*Id.*)

The key difference in the parties' proposals is that Abbyy/Lexmark attempts to limit the construction of the term to be only feature analysis and not any other possible recognition process. However, this construction would render meaningless the independent claims 7 and 13 (as opposed to claim 18). Accordingly, under the theory of claim differentiation, the Court declines to adopt Abbyy/Lexmark's restrictive construction. *See Andersen*, 474 F.3d at 1369.

Accordingly, the Court construes the term "second character recognition process" to mean: "A process for recognizing a character that is different than the first character recognition process."

### 8. "Portion of said image"

The phrase "portion of said image" appears in Claim 18 of the '342 Patent.

Abbyy/Lexmark argues that the term "portion of said image" should be construed to mean "A representation of a character." (Statement, Ex. 1.) Nuance asserts that the term is simple and additional construction would amount to meaningless verbiage. The figures of the patent set illustrate a "portion of a page" and "the same portion of a page." ('342 Patent at Figs. 3(a) and 3(b).) (*See* '342 Patent at 6:10-18.) The figures include parts of a letter and parts of a drawing. In addition, Claim 18 provides that "a portion of said image, said portion *including* a representation of said character." (*Id.* at 30:28-31.) With the word 'including' in the same phrase of the claim, it appears that the definition of a portion of said image would include more than simply the representation of a character.

Accordingly, the Court construes the term "a portion of said image" to mean: "a portion of said image."

### 9. "Determining a value related to the probability of occurrence"

The phrase "determining a value related to the probability of occurrence" appears in Claim 22 (as dependent on Claims 1 and 21) of the '009 Patent.

Abbyy/Lexmark argues that the term "determining a value related to the probability of occurrence" should be construed to mean "Computation through modeling language as a second order Markov process." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term

13

"determining a value related to the probability of occurrence" should be construed to mean "Computing a value related to the chance of occurrence within a reference sequence." (*Id.*) Abbyy/Lexmark, during oral argument before the Court, contended that the construction should allude to the purpose of the patent and should reflect that the computation is dependent on probabilities. However, its proposed construction improperly imports limitations from the specifications and there is no principal of construction which requires that the Court delineate the alleged purpose of the patent within its construction of any particular term.

Accordingly, the Court construes the term "Determining a value related to the probability of occurrence" to mean: "Computing a value related to the chance of occurrence within a reference sequence."

### 10. "Input window"

The phrase "input window" also appears in Claim 22 (as dependent on Claims 1 and 21) of the '009 Patent.

Abbyy/Lexmark argues that the term "input window" should be construed to mean "A fixed-length portion of a string of characters that is shifted to the right by one character from the beginning of the string to the end of the string." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "input window" should be construed to mean "A plurality of adjacent character candidates being processed." (*Id.*)

Again, Abbyy/Lexmark's proposed construction improperly seeks to import limitations from the specifications. The patent does not require shifting and specifically permits the window to be any length. (*See* '009 Patent at 23:12-18.)

Accordingly, the Court construes the term "input window" to mean: "A plurality of adjacent character candidates being processed."

### 11. "Groups of Elements"

The phrase "groups of elements" also appears in Claim 22 (as dependent on Claims 1 and 21) of the '009 Patent.

14

Abbyy/Lexmark argues that the term "groups of elements" should be construed to mean "Groups of characters that facilitate the generation of statistics for computing ngram probabilities." (Statement, Ex. 1.) Nuance asserts that this term should be construed to mean "groups of characters." (*Id.*)

Again, Abbyy/Lexmark, without reasoning, attempts to have the Court adopt the limitations from the specifications. During oral argument, Abbyy/Lexmark agreed to Nuance's proposed construction but requested, without legal authority, that the Court also incorporate the probability statistics contained in the table of column seven of the '009 Patent. There is no reasoned basis upon which the Court can incorporate into the construction of a claim term an illustrative example set out in the specifications. Nuance, on the other hand, proposes a clear construction that reflects the scope of the patent. (*See*, *e.g.*, '009 Patent at 6:6-9.)

Accordingly, the Court construes the term "groups of elements" to mean: "groups of characters."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms. The parties are ordered to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 by no later than July 6, 2011.

**IT IS SO ORDERED.**

Dated: June 15, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE