IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NUANCE COMMUNICATIONS, INC. A Delaware corporation,

   Plaintiff,

   v.

ABBYY SOFTWARE HOUSE, INC., a California corporation, and LEXMARK INTERNATIONAL, INC., a Delaware corporation,

   Defendants.
                                        /

No. C 08-02912 JSW

**SECOND CLAIM CONSTRUCTION ORDER**

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996). This Order construes the eight claim terms selected by the parties, which appear in three of the patents at issue in this case, United States Patent No. 6,742,161 ("the '161 Patent") called "Distributed Computing Document Recognition and Processing," United States Patent No. 6,810,404 ("the '404 Patent") called "Computer-Based Document Management System," and United States Patent No. 6,820,094 ("the '094 Patent") called "Computer-Based Document Management System."

**BACKGROUND**

Nuance Communications, Inc. ("Nuance") contends that the remaining defendants, Abbyy Software House and Abbyy USA Software House, Inc. ("Abbyy") and Lexmark International, Inc. (collectively "Abbyy/Lexmark") infringe nine of Nuance's imaging patents.

Of those nine, three relate to document processing applications of Nuance's OCR-related technologies. The Court has previously construed terms from eleven representative claims of three patents that claim improvements to the state of the art in OCR.

The Court shall address additional facts as necessary in the remainder of this Order.

## ANALYSIS

**A.     Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc*. *v*. *Safari Water Filtration Sys*., *Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372. The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments*, *Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-981.

The starting point of the claim construction analysis is an examination of the specific claim language. A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods*., *Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary

meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). A court's final construction, therefore, must accord with the words chosen by the patentee to mete out the boundaries of the claimed invention.

The court should also look to intrinsic evidence, including the written description, the drawings, and the prosecution history, if included in the record, to provide context and clarification regarding the intended meaning of the claim terms. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

Intent to limit the claims can be demonstrated in a number of ways. For example, if the patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the disputed claim term in either the specification or prosecution history," a court will defer to that definition. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In order to so limit the claims, "the patent applicant [must] set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change

3

from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367. For example the presumption of ordinary meaning will give way where the "inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

However, limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary. *Id*. at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms. *Phillips*, 415 F.3d at 1323.

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original). When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

4

Dictionaries also may play a role in the determination of the ordinary and customary meaning of a claim term. In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meanings of words...." *Phillips*, 415 F.3d at 1322. The *Phillips* court, however, also admonished that district courts should be careful not to allow dictionary definitions to supplant the inventor's understanding of the claimed subject matter. "The main problem with elevating the dictionary to ... prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within in the context of the patent." *Id*. at 1321. Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

In addition, a court has the discretion to rely upon prior art, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584. Referring to prior art may make it unnecessary to rely upon expert testimony, because prior art may be indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

**B.     Claim Construction.**

   **1.     "Archiving"**

The term "archiving" appears in Claims 1, 10, 15, 19 and 25 of the '404 Patent. The word "archiving" also appears in 21 instances dispersed across nine different claims.

Abbyy/Lexmark argue that the term "archiving" must be construed to mean "Transferring files to offline storage that cannot be readily or immediately accessed by the computer." (Parties' Amended Joint Claim Construction and Pre-hearing Statement ("Statement"), Ex. 1.) Nuance, on the other hand, in its briefing, asserted that this term did not require construction. (*Id.*) Nuance asserts that this term is a simple word used in its every day, commonly understood way and should be given its plain and ordinary meaning. *See, e.g., Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to

broad terms standing alone.") During oral argument in the *Markman* proceeding, Nuance offered a construction in order to avoid confusion. Nuance now offers that the term "archiving" be construed to mean "Designating a file, transferring a file, or storing a file for preservation or memory-saving purposes." (*See* Nuance Proposed Alternative Construction at 1.)

The key issue in construing this term is whether to allow the importation of the negative limitations suggested by Defendants. Negative limitations should not be accepted, however, absent "clear disavowal, disclaimer or estoppel." *See Paltalk Holdings, Inc. v. Microsoft Corp.*, 2008 WL 4830571, at *18 (E.D. Tex. July 29, 2008) (citing *Omega Engineering v. Raytek*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (holding that negative limitations may be justified for clear disavowal, disclaimer or estoppel, but such limitations must be must be supported by argument). Although the preferred embodiment describes archiving by, for instance, placing files onto "removable media" or "off-line," there is no indication from the claim language that the patent intends by those examples to define the term archiving. ('404 Patent at 17:13-15, 17:15-20.) Simply, the preferred embodiments use these as examples for the storage of archived files. However, these are limitations of a specific embodiment. "Limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary." *Teleflex*, 299 F.3d at 1326 ; *see also CCS Fitness*, 288 F.3d at 1366. Unlike the holding in *ICU Medical, Inc. v. Alaris Medical Sys., Inc.*, 558 F.3d 1368, 1374 (Fed. Cir. 2009), the Court finds that there is sufficient intrinsic evidence that the term would not include the limitations Abbyy/Lexmark seeks to impose.

In Figure 18 of the '404 Patent, the archive interface allows the user to browse directly in an archive storage location. ('404 Patent at Fig. 18.) Accordingly, for the user to be able to browse this location, it must be accessible from this interface. Therefore, Defendants' proffered construction is untenable. Regardless, the Court finds that the construction of the term does not necessarily require the location where the electronic document is archived.

Accordingly, the Court construes the term "archiving" to mean: "Designating a file, transferring a file, or storing a file for preservation or memory-saving purposes."

6

### 2. "Electronically Analyzing"

Claims 1, 10 and 15 of the '404 Patent mentions "electronically analyzing."

Abbyy/Lexmark argue that the term "electronically analyzing" should be construed to mean "examining, without human intervention, information about an electronically stored documents, the examination involving more than mere extraction or transfer of data in a document." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "electronically analyzing" should be construed to mean "examining via a computer process." (*Id.*)

The key disputes on the construction of this term is the negative limitation sought by Defendants "without human intervention" and whether what is analyzed must be "information about an electronically stored document." However, the '404 Patent does not have a specific disclaimer or disavowal for human intervention. In fact, the patent specification clearly provides that human intervention can be involved in the archiving process when "[t]he file helper also prompts a user, if the user so desires, before the system archives a document in accordance with the user selected options." ('404 Patent at 17:25-27.) The second proposed limitation, that the analysis be restricted to information "about" a document and not extracted "from" the document goes to the construction of attribute information, which the Court's next construction. There is nothing in the term "electronically analyzing" that requires the Court to construe what is the subject of that analysis.

Accordingly, the Court construes the term "electronically analyzing" to mean: "Examining via a computer process."

### 3. "Attribute"

The word "attribute" appears in Claims 1, 15 and 25 of the '404 Patent and also appears in Claims 1, 24, 50 and 74 of the '094 Patent.

Abbyy/Lexmark argues the term "attribute" should be construed to mean "information about a document, other than data in the document." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "attribute" should be construed to mean "information associated with a document." (*Id.*)

7

The key dispute on this term is whether the "attribute" of a document is information *about* a document (e.g., the date it was created, author name, document type) or does it include information contained *in* a document (e.g., the customer's address or amount of money owed). Abbyy/Lexmark contends that the attributes extracted from the documents are the information about, and not the actual data in the document itself.

However, the dependent claims from the '094 Patent recite attributes extracted from the document itself, such as "raw text," "a key word," and "meta-text with positioning information." ('094 Patent at Claims 15, 21, 36, 61 and 24.) "Meta-text" contains both the content and the position information for any alpha-numeric information appearing in the image. ('404 Patent at 10:51-55.) The specifications clearly outline that the attribute data may include information contained in the document, such as key words, raw text, subject matter, and positioning. *See Wright Med. Tech, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) (holding that the court "must not interpret an independent claim in a way that is inconsistent with a claim which depends from it.") In addition, Claim 15 of the '404 Patent specifically discusses the process of electronically archiving an electronic document from among many "if the electronic document *contains* a document attribute or attributes that match the archiving condition." ('404 Patent at 20:44-47 (emphasis added).) The Court is persuaded that the data in the document may also be extracted as attribute data as well as data about the document.

The Court is not persuaded by Abbyy/Lexmark's contention that the prosecution history supports their proposed construction. The allusion to the Amendment dated May 4, 1999 distinguishing the Behera technology addresses the steps of archiving a document, not the definition of what an attribute may consist in. (*See* Declaration of Erik R. Puknys, Ex. 6 at 4-5.) The portion of the prosecution history addresses the difference between extraction and conditional archiving, but makes no particular representations about the proper definition of the term attribute.

Accordingly, the Court construes the term "attribute" to mean: ""information about a document."

### 4. "Archive index"

The word "archive index" appears in Claims 4, 10, 19 and 25 of the '404 Patent. The terms is also present in independent claim 33 and dependent claims 4, 10, 18, 25 and 33 of the '404 Patent.

Abbyy/Lexmark argues the term "archive index" should be construed to mean "a database in a memory device that does not contain the archived document, and that contains a link to each archived document and attributes from each document." (Statement, Ex. 1.) Nuance, on the other hand, argues the term "archive index" should be construed to mean "a data structure that contains reference information for archived documents." (*Id.*)

The central dispute in the parties' proposed constructions of this term is the proposed restriction on the location of the archive index to "a memory device that does not contain the archived document." There is, however, no clear disavowal in the intrinsic record of embodiments that may store an archive index and archived documents in the same memory device. As there is no express limitation in the claim language, the Court sees no compelling reason to import one. *See Hyperion Solution Corp. v. Outlooksoft Corp.*, 422 F. Supp. 2d 760, 773 (E.D. Tex. 2006) (holding that [i]mporting a negative limitation into a claim, particularly where the claim language does not contain such a limitation, is generally not favored.").

In addition, in Claim 9 of the '404 Patent, the location of the archive memory is a "removable storage medium." ('404 Patent at 20:12.) In general, the doctrine of claim differentiation recognizes "that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (quoting *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999)). Thus, there is a presumption that "[t]o the extent the absence of such difference in meaning and scope would make a claim superfluous, ... the difference between claims is significant." *Id.* (quoting *Tandon Corp. v. U.S.*

9

*Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). That presumption may be overcome, however, by the written description of the patent or its prosecution history. *Id.* Here, the Court finds no reason to overcome the presumption of claim differentiation or to render the dependent claims in the patent superfluous. Pursuant to the doctrine of claim differentiation, the Court finds that importing Abbyy/Lexmark's proffered location limitation would render this dependent claim meaningless.

Accordingly, the Court construes the term "archive index" to mean: "a data structure that contains reference information for archived documents."

### 5. "Separate"

The term "separate" appears in Claims 1 and 50 of the '094 Patent.

Abbyy/Lexmark argues that the term "separate" should be construed to mean "physically different." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "separate" does not require further construction. (*Id.*)

Abbyy/Lexmark argues that a separate memory must indicate that the memory is stored in a physically separate memory device or location. However, simply because the imported document and the data structure are separate does not necessarily indicate that they are located in physically separate memory devices. The '094 Patent teaches that the data structure file is used to save memory space and is stored in a separate directory, but does not indicate whether that storage is on the same or a physically different memory device. Rather, the patent permits that the two are kept separate from each other, but does not dictate that they are on physically separate devices. The Court finds the term to be clear and need no further construction and sees no reason to import the limitations suggested by Abbyy/Lexmark.

Accordingly, the Court construes the term "separate" to mean: "separate."

### 6. "Linking"

The phrase "linking" appears in Claims 1, 50 and 74 of the '094 Patent. The term also appears in fourteen dependent claims.

Abbyy/Lexmark argues that the term "linking" should be construed to mean "connecting a document to an electronic folder without storing the document in that folder." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "linking" should be construed to mean "associating a file with one or more folders." (*Id.*)

The parties appear to agree that linking creates an association or connection between a file and at least one folder. However, Abbyy/Lexmark seeks to import a negative limitation, that is, "without storing the document in that folder." All of the claims in which the term "link," "linking" or "linked" is mentioned, the patent describes an association between a document and a folder. Linking allows a single copy of a particular document to be associated with multiple folders, which provides the utility of multiple copies while expending storage space for only a single copy. (*See* '094 Patent at 5:47-62.)

The specification explains that a single copy of the document is stored in one place and multiple folders may be linked to that document. (*See id.* at 5:46-59.) However, this is merely the preferred embodiment and the invention does not require that the single copy be stored in any particular location, including the folder to which it has been linked. Accordingly, the Court is not persuaded that it can import this negative limitation proposed by Abbyy/Lexmark.

Accordingly, the Court construes the term "linking" to mean: "connecting a file with one or more folders."

**7. "Network server"**

The term "network server" appears in Claims 1, 36 and 64 of the '161 Patent and appears in seven dependent claims.

Abbyy/Lexmark argues that the term "network server" should be construed to mean "a computer, different from an application server, that provides common storage space to other computers on the same network." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "network server" should be construed to mean "a server for receiving information from or passing information to a connected network." (*Id.*)

The key difference in the parties' proposals is that Abbyy/Lexmark attempts to limit the construction of the term to be a physically different hardware device than an application server. Again, Abbyy/Lexmark's attempt to import a negative limitation is not supported by the intrinsic record. Indeed, the prosecution history confirms that a "server" may be a hardware device, but it may also be a software program. (Declaration of Abraham DeLaO, Ex. 8 at 5.) The prosecution history further confirms that the applicants distinguished prior art in the Yamauchi patent on the basis that the integrated facsimile and OCR hardware device could not disclose a connected application server and network server. (*Id.* at Ex. 7 at 5-7.) The claims confirm that the "network server" may be deployed in the Internet in addition to on a local area network, or LAN. (*See* Claims 15 and 16 of '161 Patent.) Absent clear disavowal, there again appears to be no reason to import the negative limitation of different hardware devices into the construction.

In addition, the proposed limitation requiring that the network server provide "common storage space" to other computers on the network, finds no support in the intrinsic record.

Accordingly, the Court construes the term "network server" to mean: ""a server for receiving information from or passing information to a connected network."

### 8. "Application server"

The term "application server" appears in Claims 36 and 64 of the '161 Patent.

Abbyy/Lexmark argues that the term "application server" should be construed to mean "a computer on a network, that is different from a network server computer and from servers running document processing applications that (1) has two-way connections with the network server, (2) maintains a job queue, (3) receives requests for jobs from the servers running document processing applications, (4) monitors the workload of each server running document processing applications, and (5) distributes work among the servers running document processing applications in a manner to maximize processing efficiency." (Statement, Ex. 1.) Nuance, on the other hand, argues that the term "application server" should be construed to

mean "a computer or program on a local network, the internet or other network that has two-way communications with the network server and the document processing applications." (*Id.*)

The parties agree that the application server has two-way connections with the network server, but differ as to the other facets of the construction. The remaining limitations suggested by Abbyy/Lexmark are clearly limitations imported from ideas in the specifications. However, consistent with the rest of the Court's constructions, no where in the patents did the patentees state that the application server must be a physically distinct device or that it have the specific attributes of the limitations culled from the specifications. In fact, the Court finds that the list of limitations would itself require further construction.

Accordingly, the Court construes the term "application server" to mean: "a computer or program on a local network, the internet or other network that has two-way communications with the network server and the document processing applications."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms. The parties are ordered to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 by no later than April 27, 2012.

**IT IS SO ORDERED.**

Dated: April 9, 2012

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE