M. CRAIG TYLER, *Pro Hac Vice*
ctyler@wsgr.com
ABRAHAM DELAO, *Pro Hac Vice*
adelao@wsgr.com
HENRY PAN, *Pro Hac Vice*
hpan@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
900 South Capital of Texas Highway
Las Cimas IV, Fifth Floor
Austin, Texas  78746-5546
Telephone:  (512) 338-5400
Facsimile:   (512) 338-5499

JAMES C. YOON, State Bar No. 177155
jyoon@wsgr.com
CHRISTOPHER P. GREWE, State Bar No. 245938
cgrewe@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California  94304-1050
Telephone:     (650) 493-9300
Facsimile:     (650) 565-5100

Attorneys for Plaintiff
NUANCE COMMUNICATIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NUANCE COMMUNICATIONS, INC.,<br><br>         Plaintiff,<br><br>     v.<br><br>ABBYY SOFTWARE HOUSE, et al.,<br><br>         Defendants. | Case No.: CV 08-02912 JSW-MEJ<br><br>**PLAINTIFF NUANCE COMMUNICATIONS, INC.'S RESPONSE TO ABBYY AND LEXMARK'S REQUESTS TO STRIKE PORTIONS OF THE OPPOSITION BRIEFS**<br><br>Hearing Date: May 24, 2013<br>Time:                9:00 am<br>Courtroom:      Courtroom No. 11<br>Judge:              Hon. Jeffrey S. White |

Both the ABBYY Defendants' Reply Brief in support of their Motion for Summary Judgment (Dkt. No. 646) (the "ABBYY Reply") and Lexmark's Reply Brief in support of its Motion for Summary Judgment on the '161 Patent (Dkt. No. 641) (the "Lexmark Reply") include multiple unsupported accusations that Nuance has provided new infringement theories in its Oppositions. *See e.g.*, Dkt No. 646 (ABBYY Reply, i:17-25; 2:4-10; 6:5-10; 7:3-8; 13:21-26; 14:7-14; 16:7-17; 20:2-8; and 21:4-8); Dkt No. 641 (Lexmark Reply, i:3-8; 4:12-16; 7:11-18; 9:1-15; 9:21-12:11). Pursuant to the parties' stipulation requesting leave to file a response to these accusations (Dkt No. 651), Nuance hereby responds to those arguments and includes an identification of evidence contradicting Defendants' "new theories" claims.

## I.   Nuance Did Not Present New Infringement Theories in Its Opposition to ABBYY's Motion for Summary Judgment.

The ABBYY Reply includes multiple unsupported arguments that Nuance presented new infringement theories in its Opposition to ABBYY's Motion for Summary Judgment. As an initial matter, ABBYY fails to provide *any* evidence to support its conclusions that Nuance offered new infringement theories, which makes them insufficient as a matter of law. W. SCHWARZER ET AL., CALIFORNIA PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 14:171 (The Rutter Group 2013) ("[e]videntiary facts are required to support . . . a summary judgment motion. . . . conclusory statements are not sufficient"); *see also Nat'l Steel Corp. v. Golden Eagle Ins. Co.* 121 F.3d 496, 502 (9th Cir. 1997). Moreover, had ABBYY provided any support for its assertions, these arguments would be expressly contradicted by the evidence of record because Nuance's Opposition positions are entirely consistent with its infringement contentions and Dr. Lopresti's expert report as is demonstrated below.

Nuance's Opposition presented three primary evidentiary-supported arguments, any of which was sufficient to defeat summary judgment: (1) ABBYY did not address the actual claim language of the asserted claims (but instead a generalized re-write that is inconsistent with the actual claims), (2) ABBYY belatedly seeks a new, narrow construction of "identify" that is inconsistent with the plain meaning to one of skill in the art, and (3) even under ABBYY's new, narrow construction (meaning that even if "identify" required a final, unequivocal conclusion as

ABBYY now contends), triable issues still exist based on multiple genuine issues of disputed fact. With respect to Nuance's first point, ABBYY's Reply is tellingly silent. ABBYY's motion did not address the actual language of the asserted claims, which should end ABBYY's request for summary judgment. On the second point, ABBYY claims, without identifying any support, that Nuance has sought a new claim construction for "identify." To be sure, Nuance's infringement theory regarding the '342 patent remains unchanged. Nuance relies on the plain meaning of "identifying," which is its meaning according to one of skill in the art and which is consistent with the '342 patent specification and ABBYY's own expert, employees, and patent.[1] ABBYY's interpretation, on the other hand, is contradicted by the intrinsic record.

On the third point, ABBYY again tellingly ignores the main point of Nuance's argument – that identification of characters is accomplished "with" ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ even under ABBYY's construction. The fact that context analysis may also be used in that process just adds an additional step, but does not eliminate the necessary role of feature analysis. Again, ABBYY side-steps this critical point. Instead, ABBYY provides only an argument that "Nuance now reads the claims on a different portion of the ABBYY products from those it identified in the infringement contentions and Dr. Lopresti's report" (i.e., because Nuance is purportedly raising a new infringement theory that discusses

---

[1] In its Motion, the entirety of ABBYY's support for its improper construction of "identifying" is citations to dictionary references. *See* Dkt No. 614 (ABBYY Motion, 9:1-8). In its Reply, ABBYY's citations to the '342 specification (which were not included in ABBYY's Motion) do not support ABBYY's improper construction of "identifying" because they discuss resolving ambiguity amongst a plurality of identifications (i.e., ambiguous identifications) resulting from identifying an unknown character with the '342 feature analysis process. *See* Dkt. No. 646 (ABBYY Reply, 14:15-15:5); *cf.* Dkt No. 625 (Nuance Opposition, 18:23-19:16). Additionally, the ABBYY Reply ignores claim 7 of the '489 patent (which has the same specification as that in the '342 patent) that first "identifies" a character and then <u>subsequently</u> resolves ambiguity in the identity of the character; instead, ABBYY's Reply just states that the context analysis process is "claimed in the '489 patent." *See* Dkt. No. 646 (ABBYY Reply, 15:6-10). Lastly, the ABBYY Reply ignores the fact that (1) ABBYY's '235 patent copies word-for-word over 70% of the text in its specification from the '342 patent and (2) numerous portions of the '235 patent specification teach that "identifying" can result in ambiguous identifications when ABBYY attempts to argue that the '235 patent is "completely different" from the '342 patent in describing "identifying a character." *See id.* (ABBYY Reply, 15:11-25); *cf.* Dkt No. 625 (Nuance Opposition, 21:16-22:10).

1  "context-analysis processes"). This argument ignores both the context in which the discussion of
2  "context-analysis processes" is raised and Nuance's infringement contentions. *See* Dkt. No. 646
3  (ABBYY Reply, 13:22-26; 16:1-17:2). Again, ABBYY completely ignores the actual claim
4  language in the asserted claims of the '342 patent. *See* Dkt No. 625 (Nuance Opposition, 17:15-
5  18:11, 22:11-25:20). It is within this context that Nuance's Opposition discusses "context-
6  analysis processes" to indicate that the asserted claims of the '342 patent <u>do not require</u>, as
7  ABBYY posits in its Motion, identifying or recognizing an unknown character <u>with and only</u>
8  <u>with</u> feature analysis; for example, the asserted claims allow the use of other processes, such as
9  the context analysis processes disclosed in the '342 specification, when identifying a character.
10 *See* Dkt No. 625 (Nuance Opposition, 17:15-18:11, 22:11-25:20). Nuance's Opposition is
11 entirely consistent with its infringement theory that the accused ABBYY products identify an
12 unknown character with feature analysis. *See e.g.*, Dkt No. 627 (Tyler Decl., Ex. 135
13 (Infringement Contentions ('342 Patent)), Ex. 136 (Lopresti Report ¶¶ 99-124)).

14       In relation to the '009 patent, ABBYY contends – again, without support – that Nuance
15 "presents a new infringement theory" that "when a computer executes software, it predefines
16 data structures and logic." *See* Dkt. No. 646 (ABBYY Reply, 19:18-20:13). This is not new. Dr.
17 Lopresti repeatedly explained in his expert report that the "predefining" step of the '009 patent is
18 practiced when a computer executes the accused ABBYY software. Dkt No. 627 (Tyler Decl.,
19 Ex. 136 (Lopresti Report ¶¶ 482-507)). For example, paragraphs 482, 495 and 504 of the
20 Lopresti Report discuss how the accused ABBYY products practice the "predefining" step and
21 they all state that "[c]omputing devices running FineReader practice Element…of claim 22" and
22 that "[t]hese computing devices predefine." *See id.* In short, the Lopresti Report discusses how
23 computers executing the accused ABBYY software practice the "predefining" limitation of the
24 '009 patent; no new infringement theory was presented. ABBYY's Reply simply ignores this.

25       In relation to the '161 patent, ABBYY contends (again without support) that "Nuance
26 adds a new theory that the two sections of code are separate because each can be launched from
27 different files." Dkt. No. 646 (ABBYY Reply, 21:4-8). In reality, this exact theory is described
28 in Dr. Lopresti's Report where he describes the ███████████, launched from the file

▓▓▓▓▓▓▓, as a separate process from all other ▓▓▓▓▓▓▓ processes. Dkt No. 627 (Tyler Decl., Ex. 110 (Lopresti Report ¶ 132)).

## II. Nuance Did Not Present New Infringement Theories in Its Opposition to Lexmark's Motion for Summary Judgment on the '161 Patent.

In contrast with Lexmark's unsupported conclusions in the Lexmark Reply,[2] the infringement theories presented in Nuance's Opposition regarding the '161 Patent are consistent with Nuance's infringement contentions and Dr. Lopresti's expert report. Notably, the only "proof" offered in the 12-page Lexmark Reply for its conclusory statements that Nuance's infringement theories are "belated" and "untimely" is one citation to Dr. Lopresti's expert report ("I have been asked . . . to determine whether the Lexmark Document Distributor product infringes") and one citation to Dr. Lopresti's deposition testimony regarding whether he studied specific scripts in opining on infringement. *See generally* Dkt No. 641 (Lexmark Reply, 9:21-12:11).[3] No other evidence of "new" theories is offered by Lexmark. Tellingly, Lexmark failed to provide the Court with the portions of Nuance's Infringement Contentions and Dr. Lopresti's expert report that plainly lay out Nuance's allegedly new theories. In short, there has been no withholding or late disclosure of any infringement theories.

In relation to Lexmark's general four-page argument that "Nuance filled its opposition papers with new infringement theories" and specifically that Nuance "belatedly identifies a number of customers that combined additional software with LDD to allegedly carry out the asserted claims" (*see* Dkt. No. 641 (Lexmark Reply, 9:21-12:11)), Lexmark attempts to impose a

---

[2] The Lexmark Reply requests that fourteen different portions of Nuance's Opposition (including all references to the deposition of a Lexmark Rule 30(b)(6) witness), twenty exhibits to the Tyler Declaration in support of Nuance's Opposition (Dkt No. 627), and Exhibit E and portions of Dr. Lopresti's declaration in support of Nuance's Opposition (Dkt No. 624) on the basis that Nuance is purportedly offering new infringement theories.

[3] Although not cited in the Lexmark Reply, Lexmark also submitted the declaration of its counsel, Lily Lim, for the position that that portions of Nuance's Opposition and the exhibits cited therein as well as the supporting declaration of Dr. Daniel P. Lopresti "raise[] new infringement theories." For the reasons noted in Nuance's Objections to Evidence Submitted as Part of and in Support of Lexmark's Reply, this "evidence" should be stricken. *See* Dkt No. 652 (citing Fed. R. Evid. 602, 701, 704(a), 801(c), 1002; Fed. R. Civ. P. § 56(e)(1); Civil L.R. 7-5(b)).

1  higher legal threshold that is required for proving indirect infringement and ignores Nuance's
2  infringement contentions. The first argument of Nuance's Opposition (spanning more than a
3  page) identifies legal authority stating that circumstantial evidence is sufficient to establish direct
4  infringement. Dkt No. 623 (Opposition, 2:10-3:22). Lexmark conveniently ignores this point.
5        Lexmark also ignores Nuance's infringement contentions which state that, to the extent
6  Lexmark is not liable as a direct infringer, Lexmark indirectly infringes through its "customers of
7  Accused Products in the United States." *See* Declaration of M. Craig Tyler in Support of
8  Nuance's Response to ABBYY and Lexmark's Requests to Strike Portions of the Opposition
9  Briefs ("Tyler Decl."), Ex. 154 (Infringement Contentions). Importantly, based on public
10 information, Nuance specifically identified numerous Lexmark customers, including ▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as direct infringers of the '161 patent. *See id.* (Infringement
12 Contentions, pp. 5-7). Despite ▮▮▮▮▮ being specifically identified in Nuance's infringement
13 contentions prior to being referenced in Nuance's Opposition (at 7:22-28), Lexmark incorrectly
14 claims that that this is customer that was "never included in any of Nuance's infringement
15 theories until well past the close of both fact and expert discovery." Dkt. No. 641 (Lexmark
16 Reply, 10:19-23). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, identified as a specific direct infringer in
17 Nuance's Opposition (at 17:8-25), was also specifically identified in Nuance's infringement
18 contentions (*see* Tyler Decl, Ex. 154 (Infringement Contentions, p.6, ll.20-21), yet Lexmark
19 represented to this Court – again, without offering any support – that Nuance had identified this
20 customer for the "first time in the case" in its Opposition. Lexmark is clearly mistaken.
21       Further, Nuance's infringement contentions made clear that its disclosures were "known
22 examples" and that Lexmark had contributed to infringement because of Lexmark's sale of the
23 accused products to customers in the United States that were adapted for use in an infringing
24 manner and not commerce suitable for non-infringing uses, and had induced infringement by
25 instructing its customers to use the Accused products in a manner that infringes the '161 patent.
26 *See id.* (Infringement Contentions, pp. 5, 7). Nuance went on to identify multiple script writing
27 tools and related documents as examples of Lexmark's inducement leaving no doubt that
28

Lexmark's assistance with script writing was a specifically disclosed aspect of Nuance's infringement theory. *See id.* (Infringement Contentions, pp. 10-13).

Notably, Lexmark did not provide any discovery on the identity of its LDD customers, and its services thereto, until it provided restricted access to its financial database only in the last month of discovery. Tyler Decl. ¶ 4.  In fact, Lexmark required that Nuance sign an agreement to treat the financial database *as source code* in order to have any access to it, which meant that Nuance had to query the database directly and have Lexmark print out every page on which Nuance sought to rely. *Id.* ¶ 4 and Ex. 155.  Of course, this financial database included no source code at all, but the identity of LDD customers and detailed descriptions of Lexmark's integration services. *Id.* ¶ 4.  This information was withheld from Nuance for years in discovery and then made available *only as source code and only during the last month of discovery. Id.*  That is why much of the evidence cited in Nuance's opposition to Lexmark's motion includes bates numbers indicating production as source code (e.g., LXK-NUANCE-SCR-PSD#####) as it was the only way that Lexmark would agree to give Nuance access to this evidence. *Id.*

Importantly, none of this late-produced Lexmark evidence changed any of Nuance's infringement theories as set forth in its infringement contentions.  It just provided further evidence of the direct infringement that Nuance had already disclosed; evidence that more than satisfies Nuance burden for proving indirect infringement, as noted in Nuance's Opposition. *See* Dkt No. 623 (Opposition, 2:10-3:22).

Finally, and perhaps most tellingly, Dr. Lopresti's expert report included these same infringement theories regarding LDD customers receiving various forms of assistance from Lexmark in configuring the product as set forth in Nuance's Opposition. Dkt No. 627 (Tyler Decl. Ex. 110 (Lopresti Report ¶¶ 299-302, 307-08).  For example, in paragraph 308 of his expert report, Dr. Lopresti provided a specific example of a customer who used scripts to configure LDD and use it in an infringing manner. (*Id.* at ¶ 308).  Dr. Lopresti also generally identified other documents and evidence confirming Lexmark's inducement through its assistance of customers in the US. (*Id.* at ¶¶ 299-302).  Dr. Lopresti also referenced Lexmark's sales information showing sales of LDD to US customers and his other reports that provide

further detail of Lexmark's inducement. (*Id.* at ¶ 298). These are not new theories. Dr. Lopresti not only set forth these exact theories but also provided specific examples of induced infringement and referred to additional sources of supporting evidence in Lexmark's sales information. These theories are entirely consistent with Nuance's Opposition.[4]

Lexmark's additional arguments regarding purported new infringement theories in Nuance's Opposition are likewise erroneous. For example, Lexmark's requests that portions of Nuance's Opposition be stricken (Dkt. No. 641 (Lexmark Reply, 12:4-11) because they present new infringement theories regarding the ▓▓▓▓▓ component of LDD, the ▓▓▓▓▓ component of LDD, and the handwriting recognition functionality in LDD. But Dr. Lopresti expressly identified the ▓▓▓▓▓ as being a "network server" as this component is claimed in the '161 patent, including its role in receiving documents to be processed, in his expert report. Dkt No. 627 (Tyler Decl. Ex. 110 (Lopresti Report ¶¶ 326-327)).[5] Dr. Lopresti also expressly identifies the ▓▓▓▓▓ as being an "application server" as this component is claimed in the '161 patent. *See id.* (Lopresti Report ¶¶ 370-375).[6] And Dr. Lopresti expressly discussed handwriting recognition functionality in LDD and provided evidence regarding the ability to recognize hand-printed text using ABBYY OCR software in his expert report. *See id.* (Lopresti Report ¶¶ 383-86).[7] The deposition testimony that Lexmark seeks to strike simply confirms that ▓▓▓▓▓ *See* Dkt No. 623 (Opposition, 16:9-16). Consequently, reliance on Mr. Speller's testimony is entirely consistent with Nuance infringement theories.

### III.   CONCLUSION

For the foregoing reasons, ABBYY and Lexmark's requests that portions of Nuance's Oppositions (and related evidence) be stricken or ignored should be denied.

---

[4] Consistent with 6:1, 6:14-23, 6:27-28, 5:25-26; 7:2-11, 7:16-9:5 and Exs. 114, 116, 123-134, 150-151 of Nuance's Opposition that Lexmark seeks to strike.
[5] Consistent with 12:20-22; 14:9-11, 11:8-19, paragraph 12 and Ex. E of Dr. Lopresti's declaration and Exs. 121,141 and 148 of Nuance's Opposition that Lexmark seeks to strike.
[6] Consistent with 5:1-2; 5:4-6 and Ex. 140 of Nuance's Opposition that Lexmark seeks to strike.
[7] Consistent with 15:23-25 of Nuance's Opposition that Lexmark seeks to strike.

| | |
|---|---|
| Dated: April 8, 2013 | WILSON SONSINI GOODRICH & ROSATI |
| | By: _/s/ M. Craig Tyler_ |
| | M. Craig Tyler |
| | Attorneys for Plaintiff<br>NUANCE COMMUNICATIONS, INC. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
NUANCE'S RESPONSE TO REQUESTS
TO STRIKE PORTIONS OF OPPOSITIONS
CASE NO. C 08-2912 JSW MEJ

8