1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

8

9

| 10 | NUANCE COMMUNICATIONS, INC., | Case No.   C 08-02912 JSW |
|----|------|------|
| 11 | Plaintiff, | **PROPOSED FINAL JURY INSTRUCTIONS** |
| 12 | v. | |
| 13 | ABBYY USA SOFTWARE HOUSE, INC., a California corporation, ABBYY SOFTWARE, | |
| 14 | LTD., a Cyprus corporation, ABBYY PRODUCTION, LLC, a Russian corporation, and | |
| 15 | LEXMARK INTERNATIONAL, INC., a Delaware corporation, | |
| 16 | | |
| 17 | Defendants. | |

18

19

20

21

22

23

24

25

26

27

28

1        The Court HEREBY ADVISES the parties that the following constitutes its proposed final

2   jury instructions.  The parties shall file any objections by no later than 8:00 a.m. on August 21,

3   2013.

4

5        **IT IS SO ORDERED.**

6   Dated:  August 20, 2013               _____

7

8                            JEFFREY S. WHITE
                         UNITED STATE DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 1 RE DUTY OF JURY**

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case.

Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

1

2

**FINAL JURY INSTRUCTION NO. 2 RE BURDEN OF PROOF ─ PREPONDERANCE OF THE EVIDENCE**

3

4

When a party has the burden of proof on any claim or defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or defense is more probably true than not true.

5

You should base your decision on all of the evidence, regardless of which party presented it.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 3 RE BURDEN OF PROOF ─ CLEAR AND CONVINCING EVIDENCE**

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

**FINAL JURY INSTRUCTION NO. 4 RE TWO OR MORE PARTIES ─ DIFFERENT LEGAL RIGHTS**

You should decide the case as to each party separately. Unless otherwise stated, the instructions apply to all parties.

# FINAL JURY INSTRUCTION NO. 5 RE WHAT IS EVIDENCE

The trial is now over. The evidence you are to consider in deciding what the facts are consists of:

1.    the sworn testimony of any witness;

2.    the exhibits which are received into evidence; and

3.    any facts to which the lawyers have agreed.

**FINAL JURY INSTRUCTION NO. 6 RE WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits that were received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

    1.      Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they said in their opening statements and throughout the trial, and what they will say in their closing arguments, or at other times are all intended to help you interpret the evidence. But these arguments and statements are not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

    2.      Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

    3.      Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition, sometimes testimony and exhibits are received only for a limited purpose; when I give a limiting instruction, you must follow it.

    4.      Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

**FINAL JURY INSTRUCTION NO. 7 RE EVIDENCE FOR LIMITED PURPOSE**

Some evidence may have been admitted for a limited purpose only.

If I instructed you that an item of evidence was admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

**FINAL JURY INSTRUCTION NO. 8 RE CHARTS AND SUMMARIES NOT RECEIVED IN EVIDENCE**

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

**FINAL JURY INSTRUCTION NO. 9 RE CHARTS AND SUMMARIES IN EVIDENCE**

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial.  You may use those charts and summaries as evidence, even though the underlying documents and records are not here.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

**FINAL JURY INSTRUCTION NO. 10 RE DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

**FINAL JURY INSTRUCTION NO. 11 RE CREDIBILITY OF WITNESSES**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness said, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testified about it.

In considering the testimony of any witness, you may take into account:

      1.    the opportunity and ability of the witness to see or hear or know the things testified to;

      2.    the witness's memory;

      3.    the witness's manner while testifying;

      4.    the witness's interest in the outcome of the case and any bias or prejudice;

      5.    whether other evidence contradicted the witness's testimony;

      6.    the reasonableness of the witness's testimony in light of all the evidence; and

      7.    any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

1

**FINAL JURY INSTRUCTION NO. 12 RE IMPEACHMENT EVIDENCE ─ WITNESS**

2

3

The evidence that a witness lied under oath or gave different testimony on a prior occasion may be considered, along with all other evidence, in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness and for no other purpose.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 13 RE DEPOSITION IN LIEU OF LIVE TESTIMONY**

You heard some witnesses testify by deposition.  A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  The questions and answers are recorded.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

1

**FINAL JURY INSTRUCTION NO. 14 RE USE OF INTERROGATORIES OF A PARTY**

2

Evidence was presented to you in the form of answers of one of the parties to written
interrogatories submitted by the other side.  These answers were given in writing and under oath,
before the actual trial, in response to questions that were submitted in writing under established
court procedures.  You should consider the answers, insofar as possible, in the same way as if
they were made from the witness stand.

3

4

5

A party who has responded to an interrogatory must supplement or correct its response in a timely
manner if the party learns that in some material respect the response is incomplete or incorrect,
and if the additional or corrective information has not otherwise been made known to the other
parties during the discovery process.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# FINAL JURY INSTRUCTION NO. 15 RE EXPERT OPINION

Some witnesses, because of education or experience, were permitted to state opinions and the reasons for those opinions.

Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

1

## FINAL JURY INSTRUCTION NO. 16 RE SUMMARY OF CONTENTIONS

2

I will first give you a summary of each side's contentions in this case. I will then tell you what each side must prove to win on each of its contentions.

3

4

As I previously told you, Nuance seeks money damages from ABBYY and Lexmark for allegedly infringing the '342 and '489 patents, and from ABBYY for allegedly infringing the '161 patent by making, using, selling, offering for sale or importing products that Nuance argues are covered by the asserted claims of these patents. Nuance also argues that ABBYY and Lexmark each has (a) actively induced infringement of these claims by others and (b) contributed to the infringement of these claims by others. ABBYY and Lexmark each deny that it has infringed any of the asserted claims and also deny that it has induced or contributed to infringement by another.

5

6

7

Your job is to decide whether ABBYY and Lexmark have infringed any of the asserted claims and whether they have induced or contributed to infringement by another. If you decide that ABBYY or Lexmark have themselves infringed or have induced or contributed to infringement by another, then you will then need to decide any money damages to be awarded to Nuance.

8

9

10

Nuance also argues that ABBYY infringed Nuance's trade dress and Nuance seeks to recover any profit earned by ABBYY on sales of products that used the accused packaging. ABBYY denies that it has infringed Nuance's trade dress.

11

12

Your job is to decide whether ABBYY has infringed Nuance's trade dress. If you decide that ABBYY has infringed Nuance's trade dress, you will then need to decide the amount of profit attributable to that infringement.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                    **UTILITY PATENT JURY INSTRUCTIONS**

**FINAL JURY INSTRUCTION NO. 17 RE UTILITY PATENTS ─ INTERPRETATION OF CLAIMS**

Before you decide whether ABBYY or Lexmark has infringed the claims of the asserted Nuance patents, you will need to understand the patent claims. As I mentioned, the patent claims are numbered sentences at the end of each patent that describes the boundaries of the patent's protection. It is my job as judge to explain to you the meaning of any language in the claims that needs interpretation.

I have interpreted the meaning of some of the language in the patent claims involved in this case. You must accept those interpretations as correct. My interpretation of the language should not be taken as an indication that I have a view regarding the issue of infringement.  The decision regarding infringement is yours to make.

'342 Patent

The term "template" means "a representation of the patterns, shapes, or images of a character";

The term "character" means "one or a group of adjacent letters, digits, or other symbols";

The term "feature analysis" means "recognizing a character in an image by routines that extract features of the character and analyze the features";

The term "template matching" means "a character recognition process in which representations of the patterns, shapes, or images of an unknown character are compared with previously generated representations of the patterns, shapes, or images of known characters";

The term "second character recognition process" means "a process for recognizing a character that is different than the first character recognition process"; and

The terms "identifying" and "recognizing" each has the same plain and ordinary meaning:  "to establish the identity of."

'489 Patent

The term "character" means "one or a group of adjacent letters, digits, or other symbols";

The terms "identifying" and "recognizing" each has the same plain and ordinary meaning:  "to establish the identity of."

'161 Patent

The term "network server" means "a server for receiving information from or passing information to a connected network"; and

The term "application server" means "a computer or program on a local network, the internet or other network that has two-way communications with the network server and the document processing applications."

**FINAL JURY INSTRUCTION NO. 18 RE INFRINGEMENT – BURDEN OF PROOF**

I will now instruct you on the rules you must follow in deciding whether Nuance has proven that ABBYY or Lexmark has infringed one or more of the asserted claims of the asserted patents. To prove infringement of any claim, Nuance must persuade you that it is more likely than not that ABBYY and/or Lexmark has infringed that claim.

**FINAL JURY INSTRUCTION NO. 19 RE DIRECT INFRINGEMENT**

A patent's claims define what is covered by the patent. A product or method directly infringes a patent if it is covered by at least one claim of the patent.

Deciding whether a claim has been directly infringed is a two-step process. The first step is to decide the meaning of the patent claim. I have already made this decision, and I have already instructed you as to the meaning of the asserted patent claims. The second step is to decide whether ABBYY or Lexmark has made, used, sold, offered for sale or imported within the United States a product or method covered by an asserted claim of any of the asserted Nuance patents. If so, ABBYY and/or Lexmark infringe. You, the jury, make this decision.

With one exception, you must consider each of the asserted claims of the patent individually, and decide whether ABBYY's or Lexmark's products infringe that claim. The one exception to considering claims individually concerns dependent claims. A dependent claim includes all of the requirements of a particular independent claim, plus additional requirements of its own. As a result, if you find that an independent claim is not infringed, you must also find that its dependent claims are not infringed. On the other hand, if you find that an independent claim has been infringed, you must still separately decide whether the additional requirements of its dependent claims have also been infringed.

You have heard evidence about Nuance's commercial products as well as ABBYY and Lexmark's accused products. However, in deciding the issue of patent infringement you may not compare the accused ABBYY and Lexmark products to Nuance's commercial product.  Rather, you must compare the accused ABBYY and Lexmark products to the asserted claims of the asserted patents when making your decision regarding infringement.

Whether or not ABBYY or Lexmark knew its products infringed or even knew of the patent does not matter in determining direct infringement.

1

**FINAL JURY INSTRUCTION NO. 20 RE DIRECT INFRINGEMENT − ANALYSIS**

2

To decide whether any of ABBYY's or Lexmark's products infringe an asserted claim of an asserted Nuance patent, you must compare each product with the patent claim and determine whether every requirement of the claim is included in that product. If so, that product infringes the claim. If, however, a product does not have every requirement in the patent claim, that product does not infringe that claim. You must decide infringement for each asserted claim separately.

3

4

5

If the patent claim uses the term "comprising," that patent claim is to be understood as an open claim. An accused product infringes an open claim if every requirement in the claim is present in the accused product. The fact that a product also includes other parts or steps will not avoid infringement, as long as it has every requirement in the patent claim.

6

7

8

If an ABBYY product does not itself include every requirement in the patent claim, ABBYY cannot be liable for infringement merely because other parties supplied the missing elements, unless ABBYY directed or controlled the acts by those parties. ABBYY does not direct or control someone else's action merely because ABBYY entered into a business relationship with that person. Instead, ABBYY must specifically instruct or cause that other person to perform each step in an infringing manner, so that every step is attributable to ABBYY as controlling party.

9

10

11

Likewise, if a Lexmark product does not itself include every requirement in the patent claim, Lexmark cannot be liable for infringement merely because other parties supplied the missing elements, unless Lexmark directed or controlled the acts by those parties. Lexmark does not direct or control someone else's action merely because Lexmark entered into a business relationship with that person. Instead, Lexmark must specifically instruct or cause that other person to perform each step in an infringing manner, so that every step is attributable to Lexmark as controlling party.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**FINAL JURY INSTRUCTION NO. 21 RE CONTRIBUTORY INFRINGEMENT**

2

Nuance also argues that ABBYY and Lexmark have contributed to infringement by another entity or person. Contributory infringement may arise when someone supplies something that is used to infringe one or more of the patent claims.

3

4

In order for there to be contributory infringement by ABBYY or Lexmark, someone other than ABBYY or Lexmark, respectively, must directly infringe a claim of an asserted patent; if there is no direct infringement by anyone, there can be no contributory infringement.

5

6

If you find someone has directly infringed any of the asserted patents, contributory infringement exists for ABBYY or Lexmark, respectively, if:

7

8

    1.    ABBYY or Lexmark supplied within the United States or imported into the United States an important component of the infringing part of the product;

9

    2.    The component is not a common component suitable for non-infringing use; and

10

    3.    ABBYY or Lexmark supplied the component with the knowledge of the patent and knowledge that the component was especially made or adapted for use in an infringing manner.

11

12

A "common component suitable for non-infringing use" is a component that has uses other than as a component of the patented product or method, and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 22 RE  INDUCING PATENT INFRINGEMENT**

Nuance argues that ABBYY and Lexmark have actively induced infringement of the asserted patents by another entity or person. In order for there to be inducement of infringement by ABBYY or Lexmark, there must be direct infringement of a claim of an asserted patent in the United States by someone else; if there is no direct infringement, there can be no induced infringement. In order to be liable for inducement of infringement, ABBYY or Lexmark must:

    1.    have intentionally taken action that actually caused, urged, encouraged, or aided the infringing acts of a third party, who actually carried out the infringing activity in the United States;

    2.    have been aware of the asserted patent; and

    3.    have known that the acts it was causing would be infringing.

In order to establish inducement of infringement, it is not sufficient that another entity or person directly infringes the claim. Nor is it sufficient that ABBYY or Lexmark was aware of the act or acts by the other entity or person that allegedly constitute the direct infringement. Rather, you must find that ABBYY of Lexmark specifically intended that the other entity or person infringe Nuance's patents. For ABBYY or Lexmark to have induced infringement of an asserted claim for a method comprising a series of steps, ABBYY or Lexmark may have performed some of the claimed steps, and may have induced the third party to perform some of the claimed steps.  So long as each of the claimed steps is performed by either ABBYY or the induced third party, or by either Lexmark or the induced third party, the requirement for direct infringement is met.

If ABBYY or Lexmark did not know of the existence of the patent or that the acts it was inducing were infringing, it cannot be liable for inducement unless it actually believed that it was highly probable its actions would encourage infringement of a patent and it took intentional acts to avoid learning the truth. It is not enough that ABBYY or Lexmark was merely indifferent to the possibility that it might encourage infringement of a patent. Nor is it enough that ABBYY or Lexmark took a risk that was substantial and unjustified.

If you find that ABBYY or Lexmark was aware of the patent, but believed that the acts it encouraged did not infringe that patent, ABBYY or Lexmark cannot be liable for inducement.

**FINAL JURY INSTRUCTION NO. 23 RE WILLFUL INFRINGEMENT**

In this case, Nuance argues both that ABBYY and Lexmark infringed and, further, that they infringed willfully. If you have decided that ABBYY or Lexmark has infringed, you must go on and address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine by clear and convincing evidence that ABBYY and/or Lexmark acted recklessly.

To prove that ABBYY and/or Lexmark acted recklessly, Nuance must persuade you that it is highly probable ABBYY and/or Lexmark actually knew or should have known that its actions constituted an unjustifiably high risk of infringement of a valid and enforceable patent. To determine whether ABBYY and/or Lexmark had this state of mind, consider all facts which may include, but are not limited, to:

    1.    Whether or not ABBYY and/or Lexmark acted in accordance with the standards of commerce for its industry;

    2.    Whether or not ABBYY and/or Lexmark intentionally copied a product of Nuance's that is covered by an asserted patent;

    3.    Whether or not ABBYY and/or Lexmark made a good-faith effort to avoid infringing the asserted patents, for example, whether ABBYY and/or Lexmark attempted to design around the asserted patents; and

    4.    Whether or not ABBYY and/or Lexmark tried to cover up its infringement.

**FINAL JURY INSTRUCTION NO. 24 RE UTILITY PATENT DAMAGES — BURDEN OF PROOF**

I will instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win on any issue. If you find that ABBYY and/or Lexmark infringed any valid claim of Nuance's patents, you must then determine the amount of money damages to be awarded to Nuance to compensate it for the infringement.

The amount of those damages must be adequate to compensate Nuance for the infringement. A damages award should put the patent holder in approximately the financial position it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty. You should keep in mind that the damages you award are meant to compensate the patent holder and not to punish an infringer.

Nuance has the burden to persuade you of the amount of its damages. You should award only those damages that Nuance more likely than not suffered. While Nuance is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty. Nuance is not entitled to damages that are remote or speculative.

1

**FINAL JURY INSTRUCTION NO. 25 RE LOST PROFITS ─ GENERALLY**

2

In this case, Nuance seeks to recover lost profits for some of ABBYY's and Lexmark's sales of infringing products, and a reasonable royalty on the rest of ABBYY's and Lexmark's sales.

3

4

To recover lost profits for infringing sales, Nuance must show that but for the infringement there is a reasonable probability that it would have made sales that ABBYY and/or Lexmark made of an infringing product. Nuance must show the share of ABBYY's and Lexmark's sales that it would have made if the infringing product had not been on the market.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 26 RE LOST PROFITS — FACTORS TO CONSIDER**

Nuance is entitled to lost profits if it proves all of the following:

    1.     that there was a demand for the patented products;

    2.     that there were no non-infringing substitutes, or, if there were, the number of the sales made by ABBYY and/or Lexmark that Nuance would have made despite the availability of other non-infringing substitutes. An alternative may be considered available as a potential substitute even if it was not actually on sale during the infringement period. Factors suggesting that the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available. Factors suggesting that the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether ABBYY and/or Lexmark had to design or invent around the patented technology to develop an alleged substitute.  For a non-infringing substitute to be considered available, it had to be commercially acceptable, such that the substitute had all the beneficial characteristics of the patented invention;

    3.     that Nuance had the manufacturing and marketing capacity to make any infringing sales actually made by the infringer and for which Nuance seeks an award of lost profits; and

    4.     the amount of profit that Nuance would have made if ABBYY and/or Lexmark had not infringed.

1

**FINAL JURY INSTRUCTION NO. 27 RE LOST PROFITS — MARKET SHARE**

2

One way Nuance may prove the number of sales it would have made if the infringement had not
happened is to prove its share of the relevant market excluding infringing products. You may

3

award Nuance a share of profits equal to that market share.

4

In deciding Nuance's market share, you must decide which products are in Nuance's market.
Products are in the same market if they are sufficiently similar to compete against each other.

5

Two products are sufficiently similar if one does not have a significantly higher price than or
possess characteristics significantly different than the other.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 28 RE LOST PROFITS ─ PRICE EROSION**

Nuance can recover additional damages if it can show to a reasonable probability that, if there had been no infringement, Nuance would have been able to charge higher prices for some of its products. In that case, you may also award as additional damages the amount represented by the difference between the amount of profits that Nuance would have made by selling its product at the higher price and the amount of profits Nuance actually made by selling its product at the lower price that Nuance charged for its product. This type of damage is referred to as price erosion damage.

If you find that Nuance suffered price erosion, you may also use the higher price in determining Nuance's lost profits from sales lost because of the infringement. In calculating a patentee's total losses from price erosion, you must take into account any drop in sales that would have resulted from a higher price.

You may also award as damages the amount of any increase in costs of Nuance, such as additional marketing costs, caused by competition from the infringing product.

1  **FINAL JURY INSTRUCTION NO. 29 RE REASONABLE ROYALTY — ENTITLEMENT**

2  If Nuance has not proved its claim for lost profits, or has proved its claim for lost profits for only
   a portion of the infringing sales, then Nuance should be awarded a reasonable royalty for all
3  infringing sales for which it has not been awarded lost profits damages.

**FINAL JURY INSTRUCTION NO. 30 RE REASONABLE ROYALTY ─ DEFINITION**

A royalty is a payment made to a patent holder in exchange for the right to make, use or sell the claimed invention. This right is called a "license." A reasonable royalty is the payment for the license that would have resulted from a hypothetical negotiation between the patent holder and the infringer taking place at the time when the infringing activity first began. In considering the nature of this negotiation, you must assume that the patent holder and the infringer would have acted reasonably and would have entered into a license agreement. You must also assume that both parties believed the patent was valid and infringed. Your role is to determine what the result of that negotiation would have been. The test for damages is what royalty would have resulted from the hypothetical negotiation and not simply what either party would have preferred.

A royalty can be calculated in several different ways and it is for you to determine which way is the most appropriate based on the evidence you have heard. One way to calculate a royalty is to determine what is called an "ongoing royalty." To calculate an ongoing royalty, you must first determine the "base," that is, the product on which the infringer is to pay. You then need to multiply the revenue the defendant obtained from that base by the "rate" or percentage that you find would have resulted from the hypothetical negotiation. For example, if the patent covers a nail, and the nail sells for $1, and the licensee sold 200 nails, the base revenue would be $200. If the rate you find would have resulted from the hypothetical negotiation is 1%, then the royalty would be $2, or the rate of .01 times the base revenue of $200.

If the patent covers only part of the product that the infringer sells, then the base would normally be only that feature or component. For example, if you find that for a $100 car, the patented feature is the tires which sell for $5, the base revenue would be $5. However, in a circumstance in which the patented feature is the reason customers buy the whole product, the base revenue could be the value of the whole product. Even if the patented feature is not the reason for customer demand, the value of the whole product could be used if, for example, the value of the patented feature could not be separated out from the value of the whole product. In such a case, however, the rate resulting from the hypothetical negotiation would be a lower rate because it is being applied to the value of the whole product and the patented feature is not the reason for the customer's purchase of the whole product.

A second way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product both past and future. This differs from payment of an ongoing royalty because, with an ongoing royalty, the licensee pays based on the revenue of actual licensed products it sells. When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and future infringing sales.

In determining the reasonable royalty, you may consider the following factors:

    1.    The royalties received by Nuance for the licensing of the asserted patents, proving or tending to prove an established royalty.

    2.    The rates paid by ABBYY or Lexmark for the use of other patents comparable to the asserted patents.

    3.    The nature and scope of the license, as exclusive or nonexclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

    4.    Nuance's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.      The commercial relationship between Nuance and ABBYY and/or Lexmark, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

6.      The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his nonpatented items, and the extent of such derivative or convoyed sales.

7.      The duration of the patent and the term of the license.

8.      The established profitability of the product made under the patents, its commercial success, and its current popularity.

9.      The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.

10.     The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by Nuance, and the benefits to those who have used the invention.

11.     The extent to which ABBYY and/or Lexmark has made use of the invention and any evidence probative of the value of that use.

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.

13.     The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.     The opinion and testimony of qualified experts.

15.     The amount that a licensor (like Nuance) and a licensee (like ABBYY and/or Lexmark) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

-32-

1      **FINAL JURY INSTRUCTION NO. 31 RE DATE OF COMMENCEMENT — PRODUCTS**

2      Nuance has asserted two patents against both ABBYY and Lexmark:  the '342 patent and the
       '489 patent.  Nuance has asserted a third patent, the '161 patent, against ABBYY alone.
3
       For infringement of the '342 or '489 patent, Nuance may be awarded damages starting from the
4      date that ABBYY and/or Lexmark (1) had notice of the Nuance patent and (2) was infringing the
       Nuance patent.  You may find that ABBYY had notice of the '342 or '489 patent on the date that
5      Nuance filed a lawsuit against ABBYY claiming infringement of the patent.  You may find that
       Lexmark had notice of the '342 or '489 patent on the date that Nuance filed a lawsuit against
6      Lexmark claiming infringement of the patent.  Alternatively, you may find that ABBYY and
       Lexmark both had notice of the '342 patent on the date that Nuance began marking the Nuance
7      products covered by the '342 patent with the patent number for the '342 patent.  And you may
       find that ABBYY and Lexmark both had notice of the '489 patent on the date that Nuance began
8      marking the Nuance products covered by the '489 patent with the patent number for the '489
       patent.
9
       For infringement of the '161 patent, Nuance may be awarded damages starting from April 2009.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 32 RE CALCULATING DAMAGES IN CASES OF INDUCEMENT OR CONTRIBUTORY INFRINGEMENT**

In order to recover damages for induced infringement, Nuance must either prove that the accused products necessarily infringe one or more asserted patent claims or prove acts of direct infringement by others that were induced by ABBYY and/or Lexmark. To recover damages for contributory infringement, Nuance must either prove that the accused products necessarily infringes one or more asserted patent claims or prove acts of direct infringement by others to which ABBYY and/or Lexmark made a substantial contribution.

The amount of damages for induced or contributory infringement is limited by the number of instances of direct infringement, so Nuance must further prove the number of direct acts of infringement of the asserted patent claims, for example, either by showing individual acts of direct infringement or by showing that a particular class of products directly infringe.

1

**TRADE DRESS JURY INSTRUCTIONS**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**FINAL JURY INSTRUCTION NO. 33 RE TRADE DRESS INFRINGEMENT —
INTRODUCTION**

2

3

Nuance seeks damages against ABBYY for trade dress infringement. ABBYY contends that Nuance's trade dress is unprotectable and denies that it infringed Nuance's trade dress.

4

Here are the instructions you must follow in deciding Nuance's trade dress infringement claims.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**FINAL JURY INSTRUCTION NO. 34 RE TRADE DRESS INFRINGEMENT —
DEFINITION OF TRADE DRESS
(15 U.S.C. § 1125(a))**

3

4

Trade dress is the non-functional physical detail and design of a product or its packaging that indicates or identifies the product's source and distinguishes it from the products of others.

5

6

Trade dress is the product's total image and overall appearance, and may include features such as size, shape, color, color combinations, texture, or graphics. In other words, trade dress is the form in which a person presents a product or service to the market, its manner of display.

7

8

A trade dress is non-functional if, taken as a whole, the collection of trade dress elements is not essential to the product's use or purpose or does not affect the cost or quality of the product even though certain particular elements of the trade dress may be functional.

9

10

Trademark law protects trade dress from others using the same or similar presentation of another product if that trade dress is non-functional and if consumers identify the packaging with the source of the product, distinguishing it from other sources.

11

A person who uses the trade dress of another may be liable for damages.

12

In this case, you will hear evidence about the manner in which Nuance's and ABBYY's software products were packaged.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-37-

**FINAL JURY INSTRUCTION NO. 35 RE INFRINGEMENT — ELEMENTS AND BURDEN OF PROOF — TRADE DRESS**

On Nuance's claim for trade dress infringement, Nuance has the burden of proving by a preponderance of the evidence each of the following elements:

    1.   its asserted packaging trade dress is distinctive;

    2.   its asserted packaging trade dress is nonfunctional; and

    3.   ABBYY used packaging trade dress similar to Nuance's asserted packaging trade dress without the consent of Nuance in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of ABBYY's products.

If you find that each of the elements on which the Nuance has the burden of proof has been proved, your verdict should be for Nuance. If, on the other hand, Nuance has failed to prove any of these elements, your verdict should be for ABBYY.

-38-

1

**FINAL JURY INSTRUCTION NO. 36 RE TRADE DRESS INFRINGEMENT —
PROTECTABILITY**

2

3  The first step in considering Nuance's claims that ABBYY infringed Nuance's trade dresses is to
determine whether or not the trade dress is protectable.

4  You must find that an asserted Nuance trade dress is protectable if the trade dress:

5      1.  is inherently distinctive, or has acquired distinctiveness through secondary meaning; and

6      2.  is non-functional.

7  Nuance bears the burden of proving that it's more likely than not that its trade dress is both
distinctive and non-functional. If you find that Nuance has met its burden, you must find that
8  trade dress is protectable.

9  Only if you find that Nuance's trade dress is protectable, must you consider whether ABBYY has
infringed the trade dress.  The issue of infringement will require you to assess additional
10  questions that I will explain after addressing protectability more fully.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 37 RE TRADE DRESS INFRINGEMENT —
PROTECTABILITY — INHERENT DISTINCTIVENESS**

How strongly a trade dress indicates that a good comes from a particular source is an important factor to consider in determining whether the trade dress is protectable.

Trade dress is inherently distinctive if the total impression it gives the consumer is one that identifies it as coming from a specific origin or source, whether or not that source is known to the consumer. Inherently distinctive trade dress helps consumers identify the product, distinguishing Nuance's product from that produced by others, such as ABBYY.

You should consider the total visual impression of the trade dress, not each element of it in isolation. Inherently distinctive trade dress often uses common, non-distinctive elements when considered individually. However, it is the combination of elements and the total impression that the dress conveys to the consumer that shows if it is distinctive.

In deciding whether Nuance's alleged trade dress is inherently distinctive, you should consider whether it is:

1. a common basic shape or design;

2. unique or unusual in the software field; and

3. a mere refinement of a commonly-adopted and well-known form of ornamentation for software products which consumers view as mere ornamentation.

In other words, you should look at whether Nuance's asserted trade dress is so uniquely designed that a buyer will rely on it to differentiate the source of the product and distinguish it from the products of others.

-40-

1

**FINAL JURY INSTRUCTION NO. 38 RE  TRADE DRESS INFRINGEMENT —
PROTECTABILITY — DISTINCTIVENESS — SECONDARY MEANING**

2

3    If you determined in the prior instruction that Nuance's trade dress is not inherently distinctive,
     you must consider the recognition that the trade dress has among prospective consumers in order
     to determine whether it is protectable.  This market recognition is called the trade dress's

4    "secondary meaning."

5    Trade dress acquires a secondary meaning when it has been used in such a way that its primary
     significance in the minds of the prospective consumers is not the product itself, but the

6    identification of the product with a single source, regardless of whether consumers know who or
     what that source is. You must find that the preponderance of the evidence shows that a significant

7    number of the consuming public associates Nuance's trade dress with a single source, in order to
     find that it has acquired secondary meaning.

8

9    When you are determining whether Nuance's trade dress has acquired a secondary meaning,
     consider the following factors:

10       1.  Consumer Perception.  Whether the people who purchase Nuance products that bear the
             claimed trade dress associate the claimed trade dress with Nuance;

11

12       2.  Advertisement.  To what degree and in what manner Nuance may have advertised using
             the claimed trade dress;

13       3.  Demonstrated Success.  Whether Nuance successfully used the trade dress to increase the
             sales of its products;

14

15       4.  Extent of Use.  The length of time and manner in which Nuance has used the claimed
             trade dress;

16       5.  Exclusivity.  Whether Nuance's use of the claimed trade dress was exclusive;

17       6.  Copying.  Whether ABBYY intentionally copied Nuance's trade dress; and

18       7.  Actual Confusion.  Whether ABBYY's use of its accused packaging trade dress has led to
             actual confusion among a significant number of consumers.

19

20   The presence or absence of any particular factor should not necessarily resolve whether Nuance's
     trade dress has acquired secondary meaning.

21   Trade dress that is not inherently distinctive is protectable only to the extent you find it acquired
     distinctiveness through secondary meaning.  Such trade dress is entitled to protection only as

22   broad as the secondary meaning it has acquired, if any.  If it has acquired no secondary meaning,
     it is entitled to no protection and cannot be considered a protectable trade dress.

23

24   Nuance has the burden of proving that its trade dress has acquired a secondary meaning.

25   The mere fact that Nuance is using the trade dress, or that Nuance began using it before ABBYY,
     does not mean that it has acquired secondary meaning. There is no particular length of time that
     trade dress must be used before it acquires a secondary meaning.

26

27

28

**FINAL JURY INSTRUCTION NO. 39 RE TRADE DRESS INFRINGEMENT —
PROTECTABILITY — NON-FUNCTIONALITY REQUIREMENT**

A feature of a product package design is functional if it is essential to the package's use or purpose, or if it affects the package's cost or quality. A feature is non-functional if its design makes no contribution to the package's function or operation. If the feature serves no purpose other than as an assurance that a particular entity made, sponsored or endorsed the product, it is non-functional.

To determine whether a package's particular design is functional, you should consider whether the design as a whole is functional, that is whether the whole collection of features making up the design are essential to the package's use or purpose or affect the package's cost or quality.

You should assess the following factors in deciding if a feature of the product package design is functional or non-functional:

1. The Design's Utilitarian Advantage.  In considering this factor, you may examine whether the particular design feature yields a utilitarian advantage over how the package might be without that particular feature. If there is a utilitarian advantage from having the particular feature, this would weigh in favor of finding the feature is functional; if it seems merely ornamental, incidental, or arbitrary it is more likely to be nonfunctional;

2. The Design's Method of Manufacture.  In considering this factor, you may examine whether the particular feature result from a relatively simple or inexpensive method of manufacture. If the feature is a result of a particularly economical production method, this weighs in favor of finding the feature is functional; if it is essential to the use or purpose of the product packaging or affects its cost or quality, it is more likely functional;

3. Availability of Alternate Designs.  In considering this factor, you may examine whether an alternate design could have been used, so that competition in the market for that type of product would not be hindered by allowing only one person to exclusively use the particular package design or configuration. For this to be answered in the affirmative, the alternatives must be more than merely theoretical or speculative. They must be commercially feasible. The unavailability of a sufficient number of alternate designs weighs in favor of finding the design or feature is functional; and

4. Advertising Utilitarian Advantage in the Design.  In considering this factor, you may examine whether the particular package design or configuration has been touted in any advertising as a utilitarian advantage, explicitly or implicitly. If a seller advertises the utilitarian advantages of a particular feature of the package design, this weighs in favor of finding that feature is functional.

If you find, after considering the first two factors, that the whole collection of features making up the product packaging design is essential to the package's use or purpose or affects the package's cost or quality, then the design is functional and you need not consider further factors.

Nuance has the burden of proving non-functionality of its trade dress by a preponderance of the evidence.

-42-

**FINAL JURY INSTRUCTION NO. 40 RE INFRINGEMENT ─ LIKELIHOOD OF CONFUSION ─ FACTORS ─ *SLEEKCRAFT* TEST**

You must consider whether ABBYY's use of Nuance's trade dress is likely to cause confusion about the source of Nuance's or ABBYY's products.

I will suggest some factors you should consider in deciding whether there is a likelihood of confusion. The presence or absence of any particular factor that I suggest should not necessarily resolve whether there was a likelihood of confusion, because you must consider all relevant evidence in determining this. As you consider the likelihood of confusion you should examine the following.

1. Strength or Weakness of Nuance's Trade Dress.  The more the consuming public recognizes Nuance's trade dress as an indication of origin of Nuance's goods, the more likely it is that consumers would be confused about the source of ABBYY's goods if ABBYY uses a similar packaging design.

2. ABBYY's Use of the Trade Dress.  If ABBYY and Nuance use their packaging designs on the same, related, or complementary kinds of goods, there may be a greater likelihood of confusion about the source of the goods than otherwise.

3. Similarity of Nuance's and ABBYY's package designs.  If the overall impression created by Nuance's trade dress in the marketplace is similar to that created by ABBYY's packaging design in appearance, there is a greater chance of likelihood of confusion.

4. Actual Confusion.  If use by ABBYY of Nuance's trade dress has led to instances of actual confusion, this strongly suggests a likelihood of confusion.  However actual confusion is not required for a finding of likelihood of confusion.  Even if actual confusion did not occur, ABBYY's use of the trade dress may still be likely to cause confusion.  As you consider whether the trade dress used by ABBYY creates for consumers a likelihood of confusion with Nuance's trade dress, you should weigh any instances of actual confusion against the opportunities for such confusion.  If the instances of actual confusion have been relatively frequent, you may find that there has been substantial actual confusion.  If, by contrast, there is a very large number of opportunities for confusion, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.  Evidence of confusion from surveys prepared for purposes of this litigation can be used to establish actual confusion.

5. ABBYY's Intent.  Knowing use by ABBYY of Nuance's trade dress to identify similar goods may show an intent to derive benefit from the reputation of Nuance's products, suggesting an intent to cause a likelihood of confusion. On the other hand, even in the absence of proof that ABBYY acted knowingly, the use of Nuance's trade dress to identify similar goods may indicate a likelihood of confusion.

6. Marketing/Advertising Channels.  If Nuance's and ABBYY's products are likely to be sold in the same or similar stores or outlets, or advertised in similar media, this may increase the likelihood of confusion.

7. Consumer's Degree of Care.  The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in the Nuance's and ABBYY's packaging designs.

1    **FINAL JURY INSTRUCTION NO. 41 RE TRADE DRESS DAMAGES IN GENERAL**

2    It is the duty of the Court to instruct you about the measure of damages. By instructing you on
3    damages, the Court does not mean to suggest for which party your verdict should be rendered.

4    If you find for Nuance on its trade dress claim, you must determine Nuance's damages. Nuance
     has the burden of proving damages by a preponderance of the evidence.  Damages mean the
     amount of money that will reasonably and fairly compensate Nuance for any injury you found
5    was caused by ABBYY's use of the infringing packaging designs.

6    It is for you to determine what damages, if any, have been proved.  Your award must be based
7    upon evidence and not upon speculation, guesswork or conjecture.

8    In this case, Nuance is seeking ABBYY's profits on the products that it believes infringe
     Nuance's trade dress.  Damages for trade dress infringement started on the date that ABBYY's
9    infringing conduct began. You may award Nuance money damages for all violations that
     occurred on the date the infringing ABBYY product was released and any date after that.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 42 RE TRADE DRESS DAMAGES –
DEFENDANTS' PROFITS (15 U.S.C. § 1117(a))**

If you find for Nuance on its trade dress claim, Nuance is entitled to any profits earned by ABBYY that are attributable to the infringement, which Nuance proves by a preponderance of the evidence.

Profit is determined by deducting all expenses from gross revenue.

Gross revenue is all of ABBYY's receipts from using the trade dress in the sale of infringing ABBYY products. Nuance has the burden of proving ABBYY's gross revenue by a preponderance of the evidence.

Expenses are all operating, overhead, and production costs incurred in producing the gross revenue. ABBYY has the burden of proving these expenses by a preponderance of the evidence.

ABBYY has the burden of proving the portion of the profit attributable to factors other than use of the infringed trade dress by a preponderance of the evidence.  Unless you find that ABBYY has proven that a portion of the profit from the sale of ABBYY products using Nuance's trade dress is attributable to factors other than use of the trade dress, you shall find that the total profit is attributable to the infringement.

1

**CLOSING INSTRUCTIONS**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**FINAL JURY INSTRUCTION NO. 43 RE TAKING NOTES**

2

You may have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**FINAL JURY INSTRUCTION NO. 44 RE DUTY TO DELIBERATE**

2

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

3

4

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

5

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

6

7

Do not hesitate to change your opinion if the discussion persuades you that you should.  Do not come to a decision simply because other jurors think it is right.

8

9

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FINAL JURY INSTRUCTION NO. 45 RE COMMUNICATION WITH COURT**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the courtroom deputy, signed by your presiding juror or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FINAL JURY INSTRUCTION NO. 46 RE RETURN OF VERDICT

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.